IN THE FEDERAL DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| CHARLENE THEILE, | ] |
| Plaintiff, | ] |
| .vs | ] No. 2:06-CV-_____ |
| THE FANEUIL GROUP, | ] |
| Defendant. | ] |

**COMPLAINT**

Plaintiff Charlene Theile files her complaint for breach of commissions contract and sex and age discrimination and retaliation in employment against the defendant and avers:

1. This Court is empowered to hear the plaintiff's Title VII and Equal Pay Act claims under its federal jurisdiction authority codified at *28 U.S.C. §1331*. The plaintiff's state law claims are before the Court pursuant to its diversity of citizenship jurisdiction codified at *29 U.S.C. §1332*. The plaintiff's federal sex discrimination claims are premised upon the provisions of Title VII codified at *42 U.S.C. §2000e-2, §2000e-3, §2000e-5* and *§1981a*. The plaintiff's Equal Pay Act claims are premised upon the provisions of *29 U.S.C. §206(d)* and *§216(b)*. The plaintiff's age discrimination claims are premised upon the provisions of the Age

1

Discrimination In Employment Act codified at *29 U.S.C. §623* and *§626*. The plaintiff's claims against the defendant for breaching its contract for payment of commissions to the plaintiff are premised upon Tennessee state law. The plaintiff's sex and age discrimination claims against the defendant under Tennessee law are premised upon the provisions of *T.C.A. §4-21-301, §4-21-401,* and *§4-21-311*.

2. The plaintiff is a white female fifty (50) years of age. She was born on November 5, 1955. The plaintiff is a resident of Sullivan County, Tennessee. At all times pertinent to her federal and state law employment-related claims Ms.Theile was employed by The Faneuil Group, Inc.

3. The Faneuil Group is a foreign-headquartered business entity operating in Canada and throughout the United States. During the plaintiff's employment with the defendant she lived in Sullivan County, Tennessee, and worked for the defendant in Tennessee. The defendant also maintained U.S. sales offices in Boston, Massachusetts and Newton, Massachusetts. The Faneuil Group Inc. is a privately held provider of customer contact services, including telecommunications and service centers for more than twenty Fortune 500 companies in the Northern Hemisphere. The Faneuil Group always maintained an employment compliment of more than 500 individuals while the plaintiff worked for it. The defendant is subject to the requirements of all federal and state employment-related discrimination law and the Equal Protection Act. Defendant Faneuil Group has done business in the

state of Tennessee and has operated and maintained a call Center in Johnson City Tennessee. Through the presence and work-related activities of Ms.Theile in Sullivan County, Tennessee, in her corporate capacity as Account Executive, then as Director, and then as a company Vice-President, the defendant also did business in the state of Tennessee. The defendant is subject to service of process under the Tennessee Long-Arm statute, *TCA §20-2-214*. The defendant is being served pursuant to FRCP #4 by service of process under the laws of Canada. The defendant's CEO is Brian Cornick and its corporate headquarters is listed as 363 Broadway, Suite 1600, Winnipeg, MB, Canada R3C 3N9.

4. Plaintiff Theile began her employment with The Faneuil Group in January 1997 as a client service manager and operations manager attached to the Nissan Motor Corporation USA, Owner First customer service program. In that capacity, the plaintiff acted as the single point of contact for Nissan Corporation. Until March 1998, Ms. Theile supervised and managed individuals who collected and processed Nissan customer service satisfaction surveys from all over the United States. The plaintiff was stationed at The Faneuil Group's Johnson City, Tennessee office where she initially supervised 30 to 35 individuals. before finally reducing the workforce to approximately 16 individuals. Because of the plaintiff's excellent performance in the company's Johnson City office, she was assigned to the company's Bell Atlantic customer service account where she worked with middle

3

management from Bell Atlantic's Retail Markets organization to develop and execute telecommunication tool processes which enabled the company to implement its goals and generate increased revenues.

5. In 1999, the plaintiff was promoted to the position of Account Executive and became responsible for all Faneuil business contacts with the Bell Atlantic programs which were operating in Johnson City, Tennessee; Huntington, West Virginia, and Winnipeg, Manitoba, Canada. As an Account Executive, the plaintiff was also responsible for all other client programs operating at the Johnson City, Tennessee location including those for RCN, Teligent and Compaq.

6. After Bell Atlantic purchased GTE and changed its name to Verizon Communications in 2000, Ms. Theile continued to assist Verizon management in developing and implementing telemarketing programs which marketed Verizon products and calling plans. She worked internally with Faneuil information technology staff to develop computerized programs and scripting and a multitude of human resources and operations related processes which were utilized by Faneuil employees to contact members of the general public and existing Verizon customers in an effort to secure or increase their business. The Verizon customer base working area covered the Eastern United States. While at the company's Johnson City Tennessee office, Ms. Theile directly supervised three client service managers and as many as ten (10) supervisors assigned to Verizon programs. Three additional

client service managers in three different locations had dotted-line reporting authority to the plaintiff with regard to Verizon programs operating in their respective locations.

7. The plaintiff was highly successful in growing the Verizon relationship. As a result of the plaintiff's managerial efforts and client relationship, Faneuil's billable revenue rose from $242,010.00 per month in January 2002 to as much as $959,399.00 per month by February 2001. The plaintiff's commission agreement as an Account Executive with the defendant provided for her to be paid 1.5% of those higher revenues generated as a result of her initiating and implementing new programs. The company's commission agreement with Ms. Theile also provided that she be paid commissions on the revenues generated by existing programs which operated under her direction at the rate of 0.5%. The defendant willfully and deliberately breached its commission contract with the plaintiff by unilaterally decreasing the agreed upon commission and then refusing to pay the plaintiff for commissions due her after the first quarter of 2001. In May 2001, Verizon fell prey to the same economic distress suffered by other telecommunication media, cut back on its operating budget, and cancelled some of the programs which the plaintiff had been overseeing. The surviving programs developed by the plaintiff, and for which she was entitled to be paid continuing commissions, were transferred by to Faneuil's MegaCenter in Newport News,

5

Virginia.

8. Because of her success with Verizon's revenue growth, the plaintiff was promoted to Faneuil's business Development Team. As a member of the Development Team, Ms. Theile worked out of her home in Kingsport, Tennessee. Mark Leonard, Senior Vice-President in the company, gave Ms. Theile the title of Director of Business Development. The two other sales members of the business development team were young men who both held the designation of Vice-President. As time passed, the plaintiff learned that the younger men's salaries were higher than the salary the company was paying her for essentially the same work activities.

9. Before the Verizon's programs had been cancelled and before the closure of the company's Johnson City Call Center, Mark Leonard had discussed the plaintiff's joining the Business Development Team as a Vice-President at a salary of $100,000.00. But when Leonard actually installed the plaintiff on the Business Development Team, he discriminatorily installed her as a "Director" and at a lower salary of $75,000.00 per year. The plaintiff avers that in continuously treating her less favorably than younger men on the Business Development Team, the company discriminated against her because of her sex and age and began violating the Equal Pay Act.

10. As a Director the plaintiff was responsible for selling Faneuil's telemarketing services to Fortune 500 companies, as were the younger men who

6

were called Vice-Presidents and were being paid thousands of dollars a year more than she. Ms. Theile focused on the telecommunications and utility industry where she had her own leads, determined the viability of contractual relationships with each company, made proposals, conducted sales presentations and negotiate contacts. The plaintiff then started each initial operation.

11. More men were hired as Team Vice-Presidents and were paid higher salaries than the plaintiff while she continued as a member of the Business Development Team. Though the male Vice-Presidents had the same responsibilities as did the plaintiff, her performance actually exceeded the performances of a majority of the male Vice-Presidents. Although none of the Business Development Team made their sales quota goals, the plaintiff's production was consistently higher than all but one of the male Vice-Presidents.

12. Ms. Theile repeatedly questioned Mark Leonard and company CEO Brian Cornick regarding her lower salary and "lower" designation and objected in a professional manner to the company's gender discrimination.. Company management had always told the plaintiff that it was important that the Business Development Team members be designated Vice-Presidents because that title opened more corporate doors in the business world. By discriminatorily assigning the plaintiff the title of Director and continuing that designation after the plaintiff's protests, the company discriminatorily reduced the number of leads and

7

contacts which could have resulted in the plaintiff's having higher sales. While it was discriminating against the plaintiff and violating the Equal Pay Act, the company "gave" lucrative contacts and contracts to the newly hired male "Vice-Presidents."

      13. In December 2002, the company installed a female, Sharon Hooper, as Senior Vice-President of Human Resources. Upon meeting the plaintiff, Hooper asked why she held the title of Director while the male members of the Business Development Team were all Vice-Presidents. The plaintiff complained of the discriminatory title designation and discriminatory lower pay to Hooper. Hooper agreed that the plaintiff's title and lower salary were discriminatory and promised her that she would correct it. Hooper later told Ms. Theile that she could not be given a Vice-President's designation until after the company had terminated its relationship with manger Mark Leonard. In early 2003, the plaintiff objected to the continuing disparate treatment in a conversatoin with CEO Brian Cornick. Cornick responded that the company would not promote the plaintiff to the position of Vice-President as long as Leonard was her supervisor. The plaintiff complained to Cornick that since the company knew about the discriminatory circumstances, it knew the discrimination was continuing, and that he was also guilty of discriminating against her by not correcting the wage and title disparity. The company finally discharged Leonard in June 2003 and promoted the plaintiff to

"Vice-President" on July 8, 2003.

14. Even after changing the plaintiff's designation, the company continued its discriminatory pattern against the plaintiff by paying her less than it did the male Vice-Presidents. The plaintiff continued to object and reminded SVP Sharon Hooper that the male Vice-Presidents were being paid in excess of $100,000.00 per year for the same managerial and operational responsibilities and even though the plaintiff's actual performance exceeded those of the male vice-presidents. In late July 2003, the company raised the plaintiff's salary to $90,000.00 per year, which was still lower than the original amount promised the plaintiff several years before and lower than the salaries being paid to the male Vice-Presidents who worked on the same management team. As part of its continuing pattern of sex discrimination, and then retaliation, against the plaintiff, the company withheld the plaintiff's sales commissions and then used a December 2004 reduction in force as a pretext to lay her off.

15. The company continued to discriminate and retaliate against the plaintiff by refusing to pay her significant commissions due her on sales she had generated with Verizon and Eastman Chemical Company. The company paid its male Vice-Presidents commissions based on a 3-2-1 plan which equated to three percent commission of the total revenue generated by each client contract in the first year, two percent on the revenue generated in the second year and one percent on

9

revenue generated in the third year. In 2003, the plaintiff sold Faneuil services to Verizon in support of Verizon's Contingency Program to continue to provide service in the event of a labor stoppage. Instead of paying the plaintiff the 3% commission due her on revenues of $1,319,885.00, the company discriminatorily and retaliatorily gave the plaintiff only $25,000. In December 2003, Ms. Theile negotiated then consummated the sale of Faneuil services for Verizon's conference connections. The value of the contract was nearly $4,000,000.00 in revenues per year, commencing in April 2004. The company repeatedly refused to pay the plaintiff the quarterly commissions due her on that sale. In the meantime the company continued to pay the male Vice-Presidents according to the 3-2-1 commission plan for revenues generated by both new business and contract extensions which they arranged.

16. In late 2003, the plaintiff was also assigned the responsibility for negotiations of the Master Agreement with the Verizon MegaCenter. Through extensive negotiations in December 2003 through February 2004, the Plaintiff secured a one year extension of the contract under which Faneuil operated the MegaCenter. Though the value contract extension was $19,000,000.00, the company breached its agreement to pay the plaintiff the commissions due her on the Mega Center Master Agreement extension. Before the plaintiff had become a member of the Business Development Team, the company had wrongfully refused

10

to pay commissions which were due her. After the plaintiff became a member of the Business Development Team, the size of the commissions due the plaintiff increased dramatically. The wrongful refusal to honor its commitment to pay the plaintiff her commissions was part of the continuing pattern and practice of sex and age discrimination practiced against the plaintiff, a continuing violation of the Equal Pay Act, and a breach of contract.

17. The plaintiff continued to perform to the best of her ability as a Vice-President in the Business Development Group. During 2004 the business development team grew to include five men and two additional women. The company's CEO hired the two younger women under special personal circumstances and installed them as V-Ps. The male V-P's continued to be paid commissions under the company's 3-2-1 policy and continued to be paid a higher base salary than the plaintiff.

18. During the latter part of 2004, Ms. Theile attempted to secure a three year contract for Verizon Mega-Center to commence at the expiration of the one year extension she had secured earlier. However, because of upper management's decisions regarding financial and personnel details of the Master Agreement, Faneuil was underbid and did not secure the additional three year contract. On December 3, 2004, the company discriminatorily and retaliatiorily removed the plaintiff from her Vice-President's position. Though the company has

alleged that it was going through a reduction on force, it retained a newly hired younger male who was on the Business Development Team but who had not generated any revenue for the company. The plaintiff avers that her repeated objections to the company's continuing unlawful disparate pay practices and sex discrimination and to the company's continuing discriminatory refusal to pay her the commissions due her motivated the company to remove her as V-P and to keep a newly hired younger male as Vice-President.

19. Though it removed the plaintiff from her position on the Business Development Team, the company retained the plaintiff on its payroll, paid her regularly, and continued to provide her with company health insurance as part of a "severance package." While the plaintiff was still on the company's payroll, Rickson Soenen, the Senior Vice-President of Service Delivery offered the plaintiff a management position in Orlando, Florida. In February 2005, the plaintiff began working for the company as a Vice-President of Service Delivery and oversaw the company's call center operations located at 7700 Southland Blvd., Orlando, Florida for the Florida Department of Transportation and SunPass Enterprise. The plaintiff relocated to Florida in April 2005. The Florida Department of Transportation SunPass Enterprise's female call center manager appeared to resent the plaintiff's presence and superior competency at the Orlando call center and told Ms. Theile that she preferred to be in the company of men. The call center manager advised the

plaintiff on several occasions that the State needed a male in high level management positions at the call center.

20. The plaintiff was discriminatorily discharged on July15, 2005 and was replaced by a younger man. The Faneuil Group upper management advised the plaintiff that she had been over-qualified for the Orlando call center position and that the call center manager had wanted a man in her place. During the period of time the plaintiff worked in the company's Orlando call center, she continued to question SVP Hooper about the commissions the company owed her. SVP Hooper responded that "it was not the right time to ask." and that she "would work on it." Plaintiff avers that the defendant's terminating her from its payroll in July 2005 and its replacing her with man was discriminatory and was in retaliation for her having complained of sex discrimination and of the company disparate pay practices prohibited by Title VII and by the Equal Pay Act.

21. The plaintiff avers that the Faneuil Group engaged in a continuing pattern and practice of gender and age discrimination against her as described above during her employment. The plaintiff avers the company's continuing disparate and unequal pay practices, its continuing discriminatory treatment of the plaintiff while she was a member of the Business Development Team and its finally removing her from her Vice-President's position were part of a established and over-arching policy of discriminating against her because of her age and her gender. Plaintiff

avers that the company's removing her from her Vice-President's position in July 2005 was additional unlawful gender and age discrimination. The defendant's unlawful employment actions were intentional, deliberate, and in willful disregard of the plaintiff's federally protected employment rights. The defendant's repeated and continuous pattern and practice of gender and age discrimination and retaliation violated the provisions of Title VII, the ADEA, and the provisions of *T.C.A. §4-21-301* and *T.C.A. §4-21-401*. Additionally, the defendant's discriminatory and disparate pay practices described above were willful, deliberate, in bad faith, and in reckless disregard for the plaintiff's federally protected rights and also violated the provisions of the Equal Pay Act.

      22. The defendant's above described employment discrimination and retaliation and Equal Pay Act violations caused the plaintiff to suffer lost wages, to incur expenses, and has impaired her earning capacity and diminished her enjoyment of life. The plaintiff was humiliated and embarrassed by the defendant's repeated acts of discrimination and retaliation and was significantly inconvenienced. The plaintiff avers that she is entitled to all the relief provided under Title VII, the ADEA, and 42 U.S.C. §1981a, and the Equal Pay Act, including reinstatement, lost wages and benefits, compensatory damages, punitive damages, liquidated damages, and pre-judgment interest on unpaid commissions and back pay.

      23. Additionally, the defendant engaged in a continuing pattern,

practice, and policy of repeatedly breaching its contract, agreement, and policy to pay the plaintiff the commissions which were due her on the sales and contracts she procured for the company. Ms. Theile avers that the company deliberately shorted her, or completely refused to pay her, commissions at the rate which it had agreed to pay her and which it regularly paid to its male employees under its established commission policy. The defendant's practice of repeatedly refusing to pay the plaintiff the commissions due her and constituted breaches of contract under Tennessee state law. The defendant's repeated and continuing breaches of contract as described above were deliberate, malicious, and willful. The plaintiff avers that she is entitled to recover all unpaid commissions due her during her tenure of employment with the company and to a judgment of compensatory and punitive damages under state law.

24. The plaintiff has filed her ADA and Title VII discrimination charges with the EEOC and has been issued only one right to sue letter. The EEOC required the plaintiff to split her administrative charges but has issued only one right to sue letter from the EEOC office in Florida. The plaintiff has requested a second right to sue letter from the Tennessee EEOC office. Ms. Theile has exhausted her administrative remedies.

WHEREFORE THE PLAINTIFF DEMANDS:

1. Judgment for all compensatory and punitive damages due her under

Title VII and the provisions of 42 U.S.C. §1981a.

    2. Judgement for all monetary relief due her under the ADEA, including an award of liquidated damages.

    3. An award of lost wages and unpaid commissions and lost employment benefits.

    4. An award of pre-judgment interest on all accrued back wages and unpaid commissions.

    5. Reinstatement to the position of a Vice-President of Sales, or alternately, an award of front pay under the federal statutes.

    6. Judgment for compensatory damages under Tennessee employment discrimination law in the amount of $2.000,000.00.

    7. Judgment for compensatory damages for breach of its commissions agreements and contracts with the plaintiff in the amount of $2,000,000.00 under Tennessee law.

    8. Judgment for punitive damages in the amount of $5,000,000.00 under Tennessee law.

    9. An award of attorney's fees under federal law.

    10. Judgment against the defendant under the Equal Pay Act for all

disparately withheld wages and commissions with an award of liquidated damages.

    11  A jury to try the plaintiff's claims.

    12.  Such other relief to which the plaintiff may be entitled

                            s/ C. R. DeVault, Jr.
                            CHARLTON R. DEVAULT, JR.
                            TN BPR #000428
                            102 Broad Street
                            Kingsport, Tennessee
                            (423) 246-3601

                            ATTORNEY FOR THE PLAINTIFF